# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHRISTIE M. PEREZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-23-013-SPS** |
| | ) | |
| **MARTIN O'MALLEY,**[1] | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

The claimant Christie Perez requests judicial review pursuant to 42 U.S.C. § 405(g) of the denial of benefits by the Commissioner of the Social Security Administration. She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

**Claimant's Background**

The claimant was born on September 4, 1979, and was 32 years old on the alleged disability onset date. (Tr. 405). She was 42 years old at the time of the most recent administrative hearing. (Tr. 388). She has completed high school and has past relevant work experience as a home attendant and nurse assistant. (Tr. 404). The claimant alleges she has been unable to work since her application date of January 18, 2012, initially alleging disability due to issues with back pain, leg pain, frequent headaches, changes in mood, depression, high anxiety, and excessive worrying. (Tr. 142, 162).

**Procedural History**

On September 13, 2012, the claimant filed an application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her application was denied. ALJ Deborah L. Rose held an administrative hearing and determined that the claimant was not disabled in a written decision dated January 31, 2014 (Tr. 518-537). The Appeals Council denied review, so the ALJ's written opinion became the final decision of the Commissioner for purposes of appeal. The claimant sought review by this Court in Case No. CIV-15-291-SPS, and on September 28, 2016, the Court reversed (Tr. 543-553), finding *inter alia* that the ALJ failed to properly analyze evidence of record as to Claimant's mental limitations. (Tr. 552). The Appeals Council adopted this order and remanded the case on December 6, 2016. The Appeals Council also noted that the claimant had filed subsequent claims and directed that all pending claims should be consolidated. (Tr. 555-556).

Following another administrative hearing, on May 9, 2017, ALJ John W. Belcher issued a second unfavorable decision. (Tr. 557-576). But the Appeals Council remanded this decision, finding the ALJ failed to consolidate all of Claimant's claims as previously ordered and directing

that the ALJ should reevaluate the claimant's maximum residual functional capacity "in light of the expanded record" and provide appropriate rationale with specific references to the evidence of record in support of the assessed limitations in accordance with *SSR* 96-8p. (Tr. 579-580).

The Claimant appeared for two additional administrative hearings in 2019. (Tr. 445-486). On September 19, 2019, ALJ Christopher Hunt issued another unfavorable decision. (Tr. 702-728). The Appeals Council remanded this decision because: (i) the ALJ failed again to comply with previous orders to consolidate the current Title II claim with the subsequent claims; (ii) the decision only adjudicated the period through the claimant's date last insured and remand was necessary to assess Claimant's maximum RFC; (iii) the ALJ failed to comply with this Court's original reason for remand and did not adequately evaluate the nature and severity of the claimant's mental impairments; and, (iv) the ALJ did not adequately evaluate the claimant's symptoms, limiting the analysis to a summarization of the objective evidence and failing to explain what was inconsistent about the evidence in comparison to her symptoms. (Tr. 608-609).

On July 12, 2022, the claimant again appeared for an administrative hearing on her claims. (Tr. 416-444). ALJ Christopher Hunt issued once again found she was not disabled in a written decision dated July 20, 2022. The Appeals Council denied review, on November 18, 2022. (Tr. 377-382), so this latest written opinion became the final decision of the Commissioner for purposes of this appeal.

## Decision of the Administrative Law Judge

In the most recent, July 2022 decision, the ALJ acknowledged that all of Plaintiff's claims, both under Title II and Title XVI, had been consolidated. (Tr. 388). The ALJ made his decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had several severe physical and mental impairments, including degenerative disc disease of the lumbar spine, obesity,

right shoulder adhesive capsulitis and calcific tendinitis, depressive disorder, bipolar disorder,

generalized anxiety disorder, post-traumatic stress disorder, and obsessive-compulsive disorder

(20 CFR 404.1520(c) and 416.920(c). (Tr. 391).

Next, he found that Claimant's impairments did not meet a listing. (Tr. 392). At step

four, he found that Claimant retained the residual functional capacity ("RFC") to perform light

work as defined in 20 C.F.R. § 404.156(b) and 416.967(b) with the following qualifications:

> (T)he claimant can lift no more than twenty pounds occasionally and
> ten pounds frequently. She can sit, stand, or walk for six hours out of
> an eight-hour workday. She can occasionally climb ramps and stairs,
> balance, stoop, kneel, crouch, and crawl. She cannot climb ladders,
> ropes, or scaffolding or be exposed to unprotected heights. The
> claimant can frequently reach overhead with the dominant right upper
> extremity. The claimant can perform simple but not detailed or
> complex tasks; the work would need to be repetitive, routine, and rote.
> She is limited to occasional contact with coworkers and supervisors and
> no contact with the general public, working with things rather than
> people. She cannot tolerate strict production standards such as fast-
> paced integral team assembly line work or poultry processing type
> work. However, she could remain on task and attentive to duties at all
> times.

(Tr. 394). The ALJ found that this RFC prevented the claimant from returning to any of her past

relevant work, to he proceeded to step five and determined that the claimant was not disabled

because there was other work that she could perform in the economy, *e.g.*, marker, cleaner—

housekeeper, and silver wrapper. (Tr. 405-406). The ALJ noted these are all unskilled light work,

with a reasoning level of 2. *Id*.

## Review

The evidence before the ALJ reflects that on March 26, 2012, Claimant presented to

CREOKS Behavioral Health ("CREOKS") for assessment (Tr. 299). She noted anxiety,

depression, isolating behavior, excessive worry, panic attacks, sadness, difficulty being around

others, family dysfunction, memory problems, forgetfulness, and poor sleep. (Tr. 299-309). On

April 4, 2012, Claimant saw Vanessa Werlla, M.D at CREOKS for medication management.  Dr. Werlla prescribed Paxil and Trazodone (297-376). In 2012, she also saw her PCP, William J. Carter, M.D., once a month from February to July primarily for back and leg pain, which he treated with Lortab. (Tr. 226-231).

On August 8, 2012, Claimant went to the ER for back pain. A physical examination revealed nontender back with very limited range of motion; X-rays were negative for significant osseous abnormalities. She received a prescription for 800 mg Ibuprofen and Tramadol (TR. 232-245).

At the CE with Dr. Ward on October 16, 2012, Claimant relayed she had chronic pain, inability to deal with people, anxiety, crying spells, nightmares, past trauma, and problems dealing with her children. Dr. Ward noted the claimant walked with a "pained, side-to-side gait." (Tr. 269-273).

Claimant underwent a physical CE with Edie Ann Carey, D.O., on October 17, 2012. (Tr. 274-279). She complained of chronic back pain radiating into her left thigh, bilateral leg and foot pain, and foot swelling. (Tr. 274). She moved all extremities well and demonstrated 5/5 strength throughout with normal reflexes. (Tr. 275). She did not exhibit any focal or sensory deficits. Range of motion in the lumbar spine was full but painful with no tenderness or spasm. Straight leg raises were negative; heel and toe walking were normal. (Tr. 275). Dr. Carey stated Claimant ambulated with a stable gait at an appropriate speed without the use of assistive devices. *Id*.

In 2012, Dr. Werlla made several medication adjustments. Claimant was typically medication compliant, but she did no show three appointments, one in May, one in September, and one in November. (Tr. 297-376).

In 2013, Claimant saw Gary Lovell, D.O., with complaints of low back pain. Physical

examinations revealed tenderness and stiffness in the lumbar spine and sacroiliac joints, and Dr. Lovell prescribed Mobic. (Tr. 295). MRI of the lumbar spine on August 19, 2013, indicated central protrusion at L4-5 of "questionable significance." (Tr. 296).

In 2013, Claimant saw Dr. Werlla, who made several medication adjustments although Claimant was not always compliant with her treatment plan at least in part due to cost. (Tr. 297-376). In late November 2013, Dr. Werlla noted that she had not seen Claimant since August and Claimant was not compliant with medications (Tr. 1336, 1320-1360). Claimant continued medication management with Dr. Werlla in 2014. *Id.* She typically complained she had stress, mood lability, and family dysfunction. *Id.* In June 2014, Claimant's PCP, Max Owen, PA, started prescribing Lexapro, Hydroxyzine, and Amitriptyline. (Tr. 1220).

At the CE with Dr. Rippy on October 22, 2015, Claimant stated she had anxiety, depression, past trauma, nightmares, avoidant behavior, excessive worry, decreased motivation and energy, difficulty leaving her home, social isolation and withdrawal, panic attacks, poor sleep, occasional thoughts of suicide, irritability, crying spells, anhedonia, and feeling afraid. (Tr. 1242-1247). She was currently receiving mental health treatment through her PCP, Mr. Owen, having left CREOKS, which she described as a bad experience. *Id.* Mr. Owen prescribed Lexapro, but Claimant could not always afford it. *Id.* On December 16, 2015, Mr. Owen noted antalgic gait, lumbar spasm, painful range of motion in the lumbar spine, tenderness in the sacroiliac joint, and positive straight leg raises on the left. (Tr. 1309-1313). Mr. Owen continued to prescribe Lexapro, Hydroxyzine, and Amitriptyline in 2015, 2016, and 2017 with no dosage adjustment. *Id.*

On December 13, 2017, after a four-year absence, Claimant returned to Dr. Lovell's office to reestablish care. (Tr. 1365). She endorsed chronic back pain and right shoulder pain, which was new. *Id.* Physical examination revealed lumbar paraspinal muscle tenderness with palpation (no

right shoulder examination was performed). (Tr. 1366). Claimant's prescriptions for Hydroxyzine, Meloxicam (Mobic), Amitriptyline, and Lexapro were refilled. (Tr. 1367).

On November 21, 2018, Claimant reported back and right shoulder pain and stated her psychotropic medications were not helping; her anxiety and depression had increased due to stress at home. (Tr. 1431-1441). She exhibited pain with palpation of the lumbar spine and with position changes. *Id.* Rebecca Haynes, APRN-CNP (at Dr. Lovell's office), started her on Cymbalta and ordered an MRI. *Id.* The MRI of the lumbar spine on January 15, 2019, revealed broad-based disc bulge at L5-S1 and small annular tear. (Tr. 1408-1410).

On February 13, 2019, Claimant told Ms. Haynes that she continued to experience low back pain and now additional pain in the right lumbar area. (Tr. 1437). She exhibited some firmness to the lumbar musculature and pain with palpation. Ms. Haynes prescribed a short course of muscle relaxers and referred her to an orthopedist. (Tr. 1437-1438).

A physical examination on March 7, 2019, revealed tenderness to palpation over the lower lumbar spine, pain with flexion and extension, and tenderness over both cluneal nerves. (Tr. 1453). Claimant was diagnosed with degenerative disc disease L5 to S1 and was found to likely have a herniated nucleus pulpois at L5 and S1 (Tr. 1455). She was also diagnosed with cluneal nerve impingement, coccydnia and chronic low back pain. *Id.* It was recommended Claimant have nerve injections bilaterally, and therapy twice a week for six weeks. *Id.*

At the CE with Dr. Pella on April 5, 2019, Claimant noted anxiety, depression, chronic pain, crying spells, poor sleep, irritability, concentration problems, fatigue, feeling on edge, high stress level, excessive worry, anxious avoidance, dislike of being around others, panic attacks, hypervigilance, exaggerated startle response, manic episodes, racing mind, memory problems, feeling overwhelmed, and past trauma. (Tr. 1411-1415).

A physical examination on August 2, 2019, showed diminished reflexes in all four extremities but 5/5 strength with intact sensation. The orthopedist who examined the claimant recommended surgical intervention at L5-S1 (Tr. 1458-1465).

On March 2, 2021, Claimant saw Dana Ainsworth, APRN-CNP (at Ms. Haynes' clinic) with complaints of increased anxiety, and reported the Amitriptyline was ineffective. Lumbar spine examination was abnormal, but the claimant had intact sensation and normal strength, balance, and deep tendon reflexes. (Tr. 1627-1632). Ms. Ainsworth refilled Cymbalta, Hydroxyzine, and Celebrex. *Id.* Claimant had a normal back examination but tenderness and spasm in the right shoulder on April 6, 2021. Ms. Ainsworth prescribed a muscle relaxer. (Tr. 1631).

On October 29, 2021, physical examination revealed right shoulder muscle tightness but normal back. (Tr. 1565-1568). Tamara Sadler, APRN-CNP (at Ms. Ainsworth's clinic) continued Claimant's medications (Cymbalta, Metformin, and Celebrex) without change and added a muscle relaxer, Sertraline (Zoloft), and Hydroxyzine due to reports of increased anxiety and depression. *Id.* Claimant returned to Ms. Sadler on February 10, 2022, with continuing complaints of right shoulder pain and stiffness. Claimant's right shoulder X-rays revealed calcific tendinitis but no acute osseous abnormality. (Tr. 1567-1568).

On March 2, 2022, a right shoulder examination indicated "significant" discomfort with active and passive range of motion, reduced range of motion, and "severely" diminished strength secondary to discomfort. (Tr. 1583-1588). All exams reproduced the claimant's discomfort. Claimant's right upper extremity had normal alignment and intact distal motor function. The orthopedist examining her recommended conservative treatment—physical therapy—as her A1c was too high for a steroid injection. *Id.*

Claimant's BMI has exceeded 30 throughout the record, typically ranging in the mid to high 40s. (Tr. (Tr. 297-376, 1219-1241, 1309-1319, 1361-1389, 1426-1430, 1456-1457, 1532-1575). At the three hearings, Claimant testified to back problems, severely reduced exertional abilities, anxiety, emotional lability, social isolation, and difficulty interacting with others. (Tr. 518-537, 553-556, 582-605).  However, the ALJ found Claimant's statements about the intensity, persistence, and limiting effects of her symptoms are not consistent with the objective evidence. (Tr. 399).

As to her mental impairments, the ALJ noted Claimant engaged in two years of mental health treatment at CREOKS Behavioral Health ("CREOKS") beginning in March 2012.  (Tr. 246-256, 400). She was diagnosed with an anxiety disorder and assigned a Global Assessment of Functioning ("GAF") score of 49. (Tr. 253-254). She was recommended for medication and case management services, in addition to group therapy. (T. 255-256). She remained in treatment through CREOKS through May 2014. (Tr. 323-367, 371-376, 1191, 1336-46).

After May 2014, Claimant followed with various primary care clinics, and she was kept on psychotropic medications. (Tr. 1219-20, 1244, 1309-11, 1361-62, 1365-66, 1437-38, 1550-72). During routine appointments, she generally had a normal or euthymic mood (Tr. 1311, 1314, 1437, 1553, 1559), and she retained normal memory, insight, and judgment (Tr. 1311, 1314). On one occasion, Claimant appeared tearful and anxious, though she admitted to increased stress in her life and noncompliance with medications (Tr. 1361). At that time, her medication was adjusted (Tr. 1361-62).

During the relevant period, Plaintiff attended three separate consultative examinations (Tr. 269-71 (October 2012 CE with Kathleen Ward, Ph.D.); Tr. 1244-47 (October 2015 CE with Alyssa Rippy, Ph.D.); Tr. 1411-18 (April 2019 CE with Russell Pella, Ph.D.)). During all three examinations, diagnostic interviews and mental status examinations were conducted (Tr. 269-71; 1244-47; 1411-18).

-10-

During the final examination in April 2019, formal intelligence and memory testing was also conducted. (Tr. 1411-18).

Four state agency psychological consultants also reviewed Plaintiff's case over the relevant period. In November 2012 and January 2013, two consultants, David Atkins, Ph.D. and Diane Hyde, Ph.D., opined that Plaintiff could perform simple and some complex tasks in a familiar setting with routine supervision, but she had to avoid frequent contact with the general public. (Tr. 60, 65).

In October 2015, Cynthia Kampschaefer, Psy.D., found that Plaintiff could still perform simple and some complex tasks, relate with others on a superficial basis, and adapt to a work situation (Tr. 619-23, 629-34). Finally, in February 2016, a fourth state agency consultant, Joan Holloway, Ph.D., found that Plaintiff was limited to only simple tasks with routine supervision (Tr. 643-49, 656-62). She added that Plaintiff could relate to supervisors and coworkers on an incidental work basis, but not with the general public. (Tr. 649, 662).

In September 2019, during one of Plaintiff's hearings, an impartial medical expert, Daniel Hamill, Ph.D., testified as to Plaintiff's mental impairments. (Tr. 445, 449-53). He opined that, overall, Plaintiff should avoid any interaction with the public, forced-pace work, and attention to detail or complex work. (Tr. 453).

At the August 29, 2014, administrative hearing, Claimant testified she was fired from her job in January of 2010. She was tearful and cried throughout the hearing. She said she missed work due to back issues, and because she could not drive in the rain, secondary to anxiety. Claimant testified her back is painful and causes her to not want to do anything. She also testified her weight affects her. (Tr. 518-537).

Testimony from the April 12, 2017, administrative hearing, Claimant testified she is 5'5" and weighs 275 pounds. She stated she was not compliant with her medication regimen because of inability to afford medications. The claimant's representative contended that the medications

prescribed, and the counseling offered at CREOKS was not helpful. Further, the claimant did not like to participate in group counseling sessions, and the medications had undesirable side effects. The representative asserted that the claimant experiences back, leg, and neck pain. (Tr. 487-517).

The claimant's representative further stated that the claimant's "legs won't work" in that [she] falls when trying to get out of bed about once every two months. Her physician [] stated this is due to sciatica. The claimant's hands reportedly fall asleep two to three times daily. The claimant reportedly must change positions every ten to fifteen minutes because her back hurts and/or her feet swell. No position is comfortable. The claimant reportedly "lays down" throughout the day for a total of six to eight hours [], and she does not get anything accomplished in a normal day.

At the February 6, 2019, administrative hearing, Claimant testified "She lives in a single-story house with her 2 children ages 17 and 15. She receives food stamps and receives help from her father. She is 5'4" tall, weighs 260 pounds, and is right-handed. She has a driver's license and is able to drive a couple times per week. She stated she has back pain that has been getting worse. She stated that she can only sit about 10 minutes before she starts having back pain. She can stand for about 10 minutes, but then added that walking is better for her. She stated that she reclines in a chair or lays on her side for at least 6 hours a day. She also reported that her hands fall asleep, and she tends to drop things; her doctor has given her wrist braces. She was taking anti-depressants but took herself of them in November 2018 for 2-3 weeks. She stated that she generally has difficulty getting out of the house. She reported having anxiety to the point where she must reschedule appointments. She stated that she is not able to do simple things like wash dishes or take a shower, because it causes her a lot of issues. She was going to CREOKS but has stopped due to lack of insurance. But she added she gets free medications from here and there. (Tr. 463-486).

-12-

At the September 5, 2019, administrative hearing, Claimant testified that she no longer drives because her anxiety has gotten worse. She also testified her back pain has gotten worse since she started taking injections. She stated that her doctors have started talking about surgery, but no surgery has been scheduled. (Tr. 445-462).

Dr. Russell D. Pella, Ph.D. diagnosed Claimant with "unresolved Bipolar II Disorder, General Anxiety Disorder, Agoraphobia, Unspecified Personality Disorder, and Postraumatic Stress Disorder. (Tr. 1415). Dr. Pella noted Claimant described growing up in a chaotic, abusive, neglectful, and generally unsupportive environment. *Id.* Claimant described beatings and abuse by her father, verbal abuse by her mother, molestation by a family friend and indicated she had been raped at age 14. (Tr. 1411). Her adulthood psychological functioning has been fairly unstable as well. *Id.* She has a low educational level, and her employment history is marked by frequent job changes as a function of diminished stress tolerance. (Tr. 1415).

The record further reflects that the claimant suffers from severe mental health issues and has been diagnosed with generalized anxiety disorder ("*GAD*"), post-traumatic stress disorder ("*PTSD*"), major depressive disorder ("*MDD*") with anxious distress and psychotic symptoms, bipolar disorder, and schizoaffective disorder. (Tr. 616, 1191, 1246, 1415). Her mental health problems have caused her to be emotionally "overwhelmed," lability, social isolation, memory issues, and limited insight and judgment. (Tr. 44, 247, 271, 334, 338, 347, 349, 352, 354, 356, 357, 395, 1193, 1245, 1339, 1351, 1352, 1354, 1411, 1413-1414).

Claimant has presented with circumstantial thought process, disorganized thinking, inappropriate speech volume, and unable to express her thoughts clearly. (Tr. 347, 350, 352, 353-354, 357, 1334, 1338). One of her problem areas includes delusions and hallucinations. (Tr. 1193). Finally, the agency's own medical expert and examiners assessed Claimant as suffering from

Bipolar II Disorder, a diagnosis the ALJ also assigned a severe impairment. (Tr. 391, 450, 1415). Consequently, two of the agency's own consultative examiner reports ("*CE*") found Claimant was experiencing occupational issues due to her mental health. One found her prognosis was mixed and she was experiencing isolation and both occupational and social impairment due to her mental health issues. (Tr. 1247). Another found her thought process was unfocused due to "emotionality," recording her affect as labile. (Tr. 1413). The exam found her employment history was "marked by frequent job changes due to diminished stress tolerance," interpersonal problems, and difficulty behaving responsibly. (Tr. 1415). Claimant's psychiatric symptoms remained unresolved. *Id.* Finally, the medical expert who testified at the hearing stated the CE overstated Claimant's abilities given her working memory index and limited Claimant to remembering and carrying out simple, repetitive, three-step instructions. (Tr. 452-453).

The claimant contends, *inter alia*, that the ALJ failed to properly analyze the testimony of Dr. Hamill from the September 5, 2019 administrative hearing. Dr. Hamill testified, *inter alia*, that he "would limit [the claimant] to one/two/three-step simple/repetitive tasks[,]" noting that "her working memory index is an 83. That's a standard score that means at 100, the standard deviation is 15. That's more than one standard deviation below the mean." Dr. Hamill opined that the claimant "could get a detailed job" but did not think she could retain it. (Tr. 452-453). The ALJ mentioned and assigned moderate weight to Dr. Hamill's opinion that "the claimant could get a detailed job but would not be able to retain it" (Tr. 402), but significantly did not discuss Dr. Hamill's limitation of the claimant to one/two/three-step tasks. Nor did the ALJ include any such limitation in the claimant's RFC or in the hypothetical questions posed to the vocational expert ("VE") as to jobs the claimant could perform. (Tr. 429). *See, e. g., Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991) ("'[T]estimony elicited by hypothetical questions that do not relate

-14-

with precision all of claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.'"), *quoting Ekeland v. Bowen,* 899 F.2d 719, 724 (8th Cir. 1990).

The Commissioner observes that at least one of the jobs identified by the VE in response to the ALJ's hypothetical questions requires only two-step tasks, presumably suggesting thereby that any failure by the ALJ to include a limitation to one/two/three-step tasks in the claimant's RFC may have been harmless error. This would make sense *if* the ALJ actually considered Dr. Hamill 's limitation to one/two/three-step tasks but rejected it, but the Court is unable to determine if this what the ALJ intended given his failure even to discuss the limitation. *See, e. g., Threet v. Barnhart,* 353 F.3d 1185, 1189 (10th Cir. 2003) ("The ALJ did not refer to this evidence, and while he is not required to discuss every piece of evidence in the record, he 'must discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects.' Without the benefit of the ALJ's findings supported by the weighing of this relevant evidence, we cannot determine whether his conclusion that Ms. Threet's disability began on March 11, 1997, is itself supported by substantial evidence. We therefore remand for the ALJ to articulate specific findings and his reasons for ignoring this evidence."), *quoting Clifton v. Chater,* 79 F.3d 1007, 1009-1010 (10th Cir. 1996) ("In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion . . . and whether he applied the correct legal standards to arrive at that conclusion. The record must demonstrate that the ALJ *considered* all of the evidence, but the ALJ is not required to *discuss* every piece of evidence.") [emphasis added; citations omitted].

The decision of the Commissioner is accordingly reversed and the case remanded to the ALJ, *inter alia*, for an explanation of Dr. Hamill's limitation of the claimant to one/two/three-step tasks. If the ALJ chooses to reject such a limitation, he should explain why he finds it unpersuasive

given his otherwise favorable treatment of Dr. Hamill's opinions. If the ALJ chooses to accept this limitation, he should include in the claimant's RFC and in any hypothetical questions posed to a VE at step five. The ALJ should then redetermine what work, if any, the claimant can perform and ultimately whether she is disabled.

### Conclusion

The Court finds that correct legal standards were not applied by the ALJ, and the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED and the case REMANDED for further proceedings consistent herewith.

**IT IS SO ORDERD this 15th day of February, 2024.**

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma